Gregory F. LEWIS

v.

STATE of Maine DEPARTMENT OF HUMAN SERVICES.

Supreme Judicial Court of Maine.

Argued March 2, 1981.

Decided Aug. 12, 1981.

William R. Johnson (orally), James Eastman Smith, Asst. Attys. Gen., Augusta, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN * and CARTER, JJ.

NICHOLS, Justice.

The Plaintiff, Gregory F. Lewis, appeals from a judgment of the Superior Court (York County) denying him relief in a Rule 80B review of action taken by the Maine Department of Human Services under the Maine State Plumbing Code, which, as applied by the Department, prohibited him from installing waste disposal systems to service two parcels of waterfront property in Kennebunkport.

In his appeal to this Court the Plaintiff broadly challenges the legality of the code and of certain provisions thereof as well as specific department actions taken thereunder.

We affirm the judgment below.

The Plaintiff owned two adjacent undeveloped parcels of land in Kennebunkport. While preparing to construct a single family dwelling on each of the two parcels, he discovered that the soil covering these parcels was beach sand. Under the Maine Plumbing Code, the installation and use of underground waste disposal systems necessary for any dwelling without access to public sewerage is regulated according to soil type and other factors. *See Maine State Plumbing Code* § 4.4, c. 4, § 9, c. 9. The parcels were not serviced by public sewerage. Accordingly, the Plaintiff applied to the Department of Human Services on February 2, 1979, proposing to install an underground septic system on each parcel and seeking a state variance of *Maine State Plumbing Code* § 4.4, c. 4 (1978). On the same date, he applied, in the alternative, for permits to install a 2500-gallon sewage holding tank on each parcel. In those applications, the Plaintiff classified the use of

Murray, Plumb & Murray, E. Stephen Murray (orally), Portland, for plaintiff.

* GLASSMAN, J., sat at oral argument and participated in the initial conference, but died before this opinion was adopted.

the proposed dwellings as seasonal. The Department denied all applications. Pursuant to 5 M.R.S.A. § 11001(1) (1978) and M.R.Civ.P. 80B, he sought review in Superior Court.

On April 17, 1979, the Plaintiff reapplied for permits to install only a subsurface septic system on each parcel. In this application, he provided the Department with the same information supplied in the initial applications and additional information describing why he felt a variance was proper. Again the Department denied the applications and again, pursuant to 5 M.R.S.A. § 11001(1) (1978) and M.R.Civ.P. 80B, the Plaintiff sought review in the Superior Court.

The two matters thus pending before the Superior Court were consolidated on December 10, 1979. The parties filed briefs. On June 27, 1980, the court denied relief in the consolidated matters. In the opinion accompanying its order, the court (1) rejected the Plaintiff's contention that the State Plumbing Code was unenforceable because the statute under which the code was promulgated constituted an unconstitutional delegation of legislative authority and (2) affirmed the Department's conclusion that the Plaintiff was not entitled under the terms of the Code to the permits he sought. Calling the court's attention to code language that purportedly did not bar the use of holding tanks for *seasonal* dwellings, *Maine State Plumbing Code* § 7.6(e), c. 7 (1978), Plaintiff's counsel moved the court to make additional findings of fact and to amend its judgment to permit at the very least the installation of holding tanks. The court denied this motion in an order filed July 10, 1980, and the Plaintiff thereupon

appealed to this Court pursuant to M.R. Civ.P. 80B(d).

*Delegation of Legislative Authority*

The Plaintiff first challenges the Superior Court's order on grounds that the statute under which the Maine State Plumbing Code was promulgated constitutes an unconstitutional delegation of legislative authority. He contends that there is an absence of specific standards within the enabling legislation, 22 M.R.S.A. § 42 (1980), to guide the Department's promulgation and enforcement of subsurface plumbing regulations.[1] Invoking a substantial body of this Court's decisional law, Lewis is asking us to hold that the alleged paucity of legislative standards renders the Department's application of the code unconstitutional. In response, the Department contends that "standards," albeit general, do exist and that these standards are sufficient considering the nature of the authority delegated to the Department and the substantial procedural mechanisms available to amend or challenge the implementation of the code.

In reviewing the total legislative scheme relevant to promulgation of the Maine Plumbing Code, as we are obliged to do in assessing a constitutional attack on a legislative delegation, *see State v. Boyajian*, Me., 344 A.2d 410, 412 (1975), we note that the Department of Human Services is charged with the general responsibility of supervising "the interests of health and life of the citizens of the State." 22 M.R.S.A. § 3 (1980). Pursuant to that duty, the Department has "general oversight and direction of the enforcement of the statutes respecting the preservation of health." *Id.* Such responsibility quite obviously includes

1. Subsection 3 of 22 M.R.S.A. § 42 provides in part as follows:

 3. Plumbing and subsurface sewage disposal. The department shall adopt rules and regulations relating to plumbing and subsurface sewage disposal systems and the installation and inspection thereof consistent with Title 30, sections 3221 to 3225 and Title 32, sections 3301 to 3507; and shall hold hearings on the first Tuesday of February and August of each year for the purpose of considering changes in the rules and regulations

pertaining to plumbing and subsurface sewage disposal systems and the installation and inspection thereof. The department shall prior to adopting or amending rules and regulations invite participation and receive written comments from other interested state agencies including: The Department of Environmental Protection; the Land Use Regulation Commission; the State Housing Authority; the Soil and Water Conservation Commission and the Plumbing Examining Board.

the prevention and control of disease and irresponsible human waste disposal.

■ Because proper plumbing and sewage disposal systems clearly serve those objectives, presumably, the Legislature granted the Department authority to "adopt rules and regulations relating to plumbing and subsurface sewage disposal systems and the installation and inspection thereof." 22 M.R.S.A. § 42(3). Section 42(3) also requires that those rules and regulations be consistent with 30 M.R.S.A. § 3221–3225 and 32 M.R.S.A. § 3301–3507. Moreover, according to 22 M.R.S.A. § 42(1), such regulations must be "necessary and proper for the protection of life, health and welfare and the successful operation of the health and welfare laws." 22 M.R.S.A. § 42(1) (1980).

We have consistently endorsed the fundamental constitutional requirement that legislation delegating discretionary authority to administrative agencies must contain standards sufficient to guide administrative action.[2] Not long ago we summarized the nature and purpose of such standards in contemporary law:

> The basic requirement ... is that there be 'sufficient standards—specific or generalized, explicit or implicit' to guide the agency in its exercise of authority so that (1) regulation can proceed in accordance with basic policy determinations made by those who represent the electorate and (2) some safeguard is provided to assist in preventing arbitrariness in the exercise of power.

*Maine School Administrative Dist. No. 15 v. Raynolds*, Me., 413 A.2d 523, 529 (1980) *quoting City of Biddeford v. Biddeford Teachers Ass'n*, Me., 304 A.2d 387, 400 (1973). *Accord Central Maine Power Co. v. Public Utilities Commission*, Me., 414 A.2d 1217, 1224 (1980). *See* 1 K. Davis, *Administrative Law* § 3.15 (1978). From the statutory provisions reviewed above, we find standards sufficient to guide the Department in exercising the authority to promulgate a state plumbing code delegated under 22 M.R.S.A. § 42(3).

In at least three respects, the legislation adequately reflects the kind of basic legislative policy determinations necessary to guide administrative regulation of plumbing and sewage. First, the basic purpose of a plumbing and sewage code clearly falls within the Department's general state responsibilities for health and welfare and, as suggested above, the statutory scheme of which 22 M.R.S.A. § 42(3) is a part provides support for the Department's promulgation of a plumbing code that serves these responsibilities by controlling plumbing and sewage disposal practices.

Second, the specific delegation of authority to promulgate plumbing and sewage regulations limits the exercise of the Department's authority by confining the Department's action to regulation of plumbing and subsurface sewage disposal systems as defined in 30 M.R.S.A. § 3221(3) and (4). Subsections (3) and (4) of 30 M.R.S.A. § 3221, to which explicit reference is required by 22 M.R.S.A. § 42(3), carefully define "plumbing"[3] and "subsurface sewage disposal system[s]."[4]

**2.** *Superintending School Committee of the City of Bangor v. Bangor Education Association*, Me., 433 A.2d 383 (1981); *Maine School Administrative Dist. No. 15 v. Raynolds*, Me., 413 A.2d 523 (1980); *Ditullio v. State Bd. of Examiners of Psychologists*, Me., 387 A.2d 757 (1978); *State v. Boynton*, Me., 379 A.2d 994 (1977); *State v. Boyajian*, Me., 344 A.2d 410 (1975); *Finks v. State Highway Commission*, Me., 328 A.2d 791 (1974); *City of Biddeford v. Biddeford Teachers Ass'n*, Me., 304 A.2d 387 (1973); *Waterville Hotel Corporation v. Bd. of Zoning Appeals*, Me., 241 A.2d 50 (1968).

**3.** Subsection 3 defines plumbing as follows:
Plumbing defined. For the purposes of this subchapter, "plumbing" means the installation, removal, alteration or repair of pipes,

fixtures and other apparatus for bringing in the water supply and removing and disposing of liquid and water-carried wastes, including the necessary piping and water connections to all types of domestic heating apparatus using water and subsurface sewage disposal systems. Except for the initial connection to a potable water supply and the final connection that discharges indirectly into a public or private disposal system, the following are excluded from this definition: all piping, equipment or material used exclusively for incorporation of liquids or gases into any product or process for use in the manufacturing or storage of any product, including product development, or for the installation, alter-

Finally, according to 22 M.R.S.A. § 42(1) all Department regulations must be both necessary and proper. Subsections 1 and 2 of 30 M.R.S.A. § 3221 clearly indicate that, subject to other statutory specifications, municipalities must meet the minimum requirements set forth by the Department and that municipalities may require more stringent plumbing and sewerage practices. Read in tandem, subsection 1 of 22 M.R.S.A. § 42 and 30 M.R.S.A. § 3221(1), (2) suggest the delegation of authority to the Department under 22 M.R.S.A. § 42(3) is further limited to prescribing only those regulations that set forth the minimum standards of plumbing and subsurface disposal systems necessary to protect public health statewide. Thus, reasonably definite standards for Department action are prescribed in the legislation before us inasmuch as the legislation clearly reveals the purpose to be served by the regulations, explicitly defines what can be regulated for that purpose, and suggests the appropriate degree of regulation.

We accordingly reject the Plaintiff's contention that the legislation provided insufficient standards to guide administrative action. Authority cited by the Plaintiff in support of his contention is clearly distinguishable. In *Small v. Maine Board of Registration and Examination in Optometry*, Me., 293 A.2d 786 (1972), we held unconstitutional a delegation of rule-making authority to the Board of Registration and Examination in Optometry. In *Small,* however, unlike the case before us, the legislation provided only that the Board could "make such rules and regulations, not inconsistent with law, as may be necessary to govern the practice of optometry, but no

rule or requirement shall be made that is unreasonable or that contravenes any provisions of this chapter." *Id.* at 787. The purpose, subject matter, or scope of such regulation was otherwise within the unfettered discretion of the Board.

In *Stucki v. Plavin*, Me., 291 A.2d 508 (1972), and in *Waterville Hotel Corp. v. Board of Zoning Appeals*, Me., 241 A.2d 50 (1968), we likewise held unconstitutional the authority delegated by municipal governments under their zoning ordinances to local zoning boards. Unlike in the case at bar, the delegation challenged in *Stucki* and *Waterville Hotel* was made by a municipality, not the state legislature. Moreover, the delegation conferred discretionary power on the municipality's Board of Zoning Appeals to approve certain uses on a case-by-case basis guided only by the requirement that, in the Board's view, general police power objectives and the city's comprehensive zoning plan be served. In the case before us, the Department's authority is more narrowly confined to regulation of plumbing and sewage disposal minimally necessary to protect public health. Further, the Department's discretion is controlled by regulations already promulgated by the Department.

Although the Plaintiff is not unreasonable in pointing out a generality in legislative standards common to *Waterville Hotel* and *Stucki* and this appeal, we have recognized that the feasibility of prescribing precise standards without frustrating the purposes of necessary legislation is relevant to an assessment of the constitutionality of a delegation. *See Superintending School Committee of the City of Bangor v. Bangor Education Association*, Me., 433 A.2d 383 (1981); *State v. Boyn-*

---

ation, repair or removal of automatic sprinkler systems installed for fire protection only or their related appurtenances or standpipes connected to automatic sprinkler systems or overhead.

4. Subsection 4, defining subsurface sewage disposal systems provides as follows:

Subsurface sewage disposal system. "Subsurface sewage disposal system" shall mean any system for disposing of wastes or waste

waters on or beneath the surface of the earth including, but not limited to, septic tanks, drainage fields, cesspools, holding tanks, surface ditches or any other fixture, mechanism or apparatus used for such purposes, but shall not include any discharge system licensed under Title 38, section 414, surface waste water disposal system or any municipal or quasi-municipal sewer or sewage treatment system.

*ton*, Me., 379 A.2d 994, 995 (1977). More specific standards were clearly feasible in *Small*, *Stucki*, and *Waterville Hotel Corp.* In the instant case effective regulation of plumbing and subsurface sewage disposal systems requires a flexibility and attention to changing technology which are incompatible with more detailed standards issued by the Legislature. Accordingly, as we said in *Boynton*, "In such situations the presence of adequate procedural safeguards to protect against an abuse of discretion by those to whom the power is delegated compensates substantially for the want of precise guidelines and may be properly considered in resolving the constitutionality of the delegation of power." *Id.* at 995.

Pursuant to the enabling legislation challenged by the Plaintiff here, 22 M.R.S.A. § 42(3), the regulations promulgated by the Department must be the subject of biannual public hearings for the purpose of considering change. *See also* 5 M.R.S.A. § 8052. Any person may petition the Department under 5 M.R.S.A. § 8055 for modification of any rule. Moreover, the regulations are subject to judicial review under 5 M.R.S.A. § 8058. 22 M.R.S.A. § 42(1). We conclude that these procedural safeguards, together with the statutory guidelines for administrative action reviewed above, satisfy the constitutional requirements of a lawful delegation of legislative authority.

### Authority to Regulate Holding Tank Systems

The Plaintiff next contends that even if the delegation of authority to the Department is constitutional, the Department is not authorized to regulate sewerage systems that merely store sewage underground but do not have any underground discharge. On this premise, he argues that his proposal to use holding tanks on each of the two parcels in question was not subject to Department regulations since the Code defines a "holding tank" as a "watertight receptacle, with an alarm device, which receives waste water from a building drain, building sewer, or privy prior to disposal at

an approved site." *Maine State Plumbing Code* c. 2. The Plaintiff claims his argument is buttressed by the presence of the adjective "disposal" in the provision authorizing the Department to regulate "subsurface sewage *disposal* systems."

We reject his contention for two reasons. First, as we observed above, the statutory provision conferring authority on the Department to regulate subsurface sewage disposal systems, 22 M.R.S.A. § 42(3), mandates reference to 30 M.R.S.A. § 3221(4) where holding tanks are explicitly included within the definition of such systems. *See* note 4 *supra*. Second, there is nothing inconsistent about defining holding tanks as a type of disposal system since disposal systems can reasonably mean systems by which sewage generated in a dwelling is disposed of and proper operation of temporary storage systems, like holding tanks, bears a substantial relation to legitimate public health concerns.

### Table 9–1 and Holding Tanks for Seasonal Dwellings

As his third argument the Plaintiff contends on appeal that, even if the Department has the authority to regulate holding tanks, both the Department and the court below erred in construing the Code to prohibit the holding tanks proposed here. The Plaintiff's initial application for permits to install one holding tank on each parcel in the event the Department concluded septic systems would be impermissible was rejected. In a letter addressed to the Plaintiff the Department found that the soil, beach sand, on each lot was of "Profile 11" type and that installation of any system (septic or holding tank) was prohibited in such soil pursuant to Table 9–1 of the Code. The Department also found that § 7.6(e) of the Code prohibited installation of holding tanks "for new construction." Accordingly, because the Department concluded that the Plaintiff did not comply with the prerequisites for a variance under § 3.6,[5] it denied him the permits he requested.[6]

---

**5.** For complete text of the Code's variance provision *see* note 8 *infra*.

**6.** After the Plaintiff moved the court to modify its judgment pursuant to M.R.Civ.P. 59, the

The Plaintiff specifically argues that Table 9–1 or § 7.6 cannot reasonably be interpreted to prohibit the holding tank permits he sought. Table 9–1, he contends, should not apply to installation of holding tanks in "Profile 11" soil because the Table is concerned with the capacity of sewage beds to safely absorb wastewater, a factor not relevant to holding tanks. He also contends that the use of the adjective "principle" (sic) in the second sentence of § 7.6 implies that holding tanks appurtenant to *seasonal* dwellings are not prohibited and that the Department is obliged to approve applications for installation of holding tanks for seasonal dwellings if the other requirements of § 7.6 are met and the proposed system otherwise complies with the Code.

■ This Court must affirm the judgment below, and thus uphold the Department's action, if the Department's interpretation and application of the provisions in question was not arbitrary or unreasonable. *Matter of Lappie,* Me., 377 A.2d 441, 444 (1977). We do not reach the issue raised by the Plaintiff concerning § 7.6 because we conclude that the Department's interpretation and application of Table 9–1 was neither arbitrary nor unreasonable.

■ Table 9–1 clearly provided that where the soil of a site is Profile 11 type, "[s]ystems ARE NOT PERMITTED on these particular soils within the Shoreland Zoning Area." The parties to this appeal do not dispute that the sites at which the Plaintiff proposed to install holding tanks

were within the Shoreland Zoning Area and had soil of Profile 11 type. Accordingly, the issue before us can be reduced to the question of whether the Department's conclusion that the word "systems" included holding tank systems was not arbitrary or unreasonable, even though Chapter 9 of the Code and Table 9–1 clearly focused on regulation of systems, which unlike holding tanks, involve proper filtration and absorbtion of regularly discharged wastewater into nearby soil beds.

While the prohibition on installation of all subsurface sewage disposal systems is inartfully, if not inconveniently, placed in the midst of a table otherwise concerned with the size of disposal area, applying that prohibition to holding tank systems is supported by the broad definition of systems set forth in the Code and the substantial relation such a prohibition has to public health. Chapter 2 of the Code defined system to include holding tanks.[7] Moreover, Chapter 9 provided that a system, for purposes of approval under that chapter, consisted of "a building sewer, treatment tank and disposal area ...." *Maine State Plumbing Code* § 9.1 c. 9 (1978). Chapter 2 also included holding tanks within the definition of treatment tanks.[8] Thus, the general definition of systems set forth in Chapter 2 of the Code and the definition provided at the outset of Chapter 9 are fully consistent with the Department's interpretation of Table 9–1 to prohibit the installation of holding tanks in Profile 11 soils.

Neither is the Department's interpretation and application of the Profile 11 prohi-

court ultimately affirmed the Department on the ground that Table 9–1 prohibited installation of any system in soils of Profile 11 type, and the Plaintiff could not comply with § 3.6(1) of the variance provision.

The Plaintiff's motion requested the court to reject the Department's finding that § 7.6 also prohibited installation of holding tank systems for new construction, but the court found it unnecessary to rule on the issue because it concluded Table 9–1 prohibited installation of holding tanks regardless of how § 7.6 should have been construed.

7. System was defined as follows:
SYSTEM means any method or device for disposing of wastewater beneath the surface

of the earth including, but not limited to, septic tank, drainage field, waterless toilet, holding tank, or any other fixture, mechanism or apparatus used for such purposes, but shall not include any wastewater discharge system licensed under Title 38, section 414, or any municipal or quasi-municipal sewer system.

8. Treatment tank was defined as follows:
TREATMENT TANK means a septic tank, an aerobic treatment tank and/or a holding tank.

bition without a rational basis. As the Department notes in its brief, installation of holding tanks in so-called alluvial and beach deposit soils poses risks to public health because of possible leakage, tank overflows, and tidal flooding in the shoreland zone. Risks are also posed by the propensity of beach sand soils to erode or to shift drastically. Moreover, the record suggests that the Department was especially concerned about the propensity of holding tanks to leak and about the capacity of certain bacteria to survive in Profile 11 soils longer than in other soil types. Thus, on the record before us, we cannot say that such risks to public health are not mitigated by application of the Table's Profile 11 prohibition to all systems, including holding tanks. We therefore conclude, as did the court below, that the Department's interpretation and application of Table 9–1 to the holding tank systems proposed by Lewis was neither arbitrary nor unreasonable.[9]

*Application for Variances Under § 3.6*

Last, the Plaintiff challenges the Department's conclusion that his applications for installation of a septic tank and leach field disposal system on each lot did not satisfy all criteria for a variance set forth in § 3.6 of the Code.[10] Specifically, while it is clear the systems proposed by the Plaintiff would not have served existing lots legally recorded before January 1, 1970, he contends that § 3.6(1) was an invalid criterion insofar as it did not bear a rational relation to those public health concerns which the Code was intended to serve. Concerning criterion (2),

the Plaintiff contends the provision embodied an unlawful delegation of authority to municipalities. Finally, he contends the record establishes that he provided sufficient evidence to meet criteria (2), (3), and (4).

■ We reject the Plaintiff's contention that § 3.6(1) does not bear a substantial relation to legitimate Department objectives. As the Department has argued, the provision affords protection from code modifications in tune with modern technology to lot owners whose subsurface sewage disposal systems were installed on the basis of less technologically advanced methods of soil testing prevalent before 1970.

■ We agree with the Plaintiff, however, as to criterion (2). While it is apparent that municipalities have a prescribed role in implementing local plumbing regulations and are subject to a variety of other state regulations which may affect the legitimacy of a particular system,[11] subsection (2) of § 3.6 does not indicate whether those factors are relevant to municipal approval and it fails to provide any guidance as to what the basis for municipal approval might be. Because an applicant for a variance must show that the system proposed will meet all four criteria, and because subsection 2 is devoid of any standards, we think the provision on its face constitutes an unlawful delegation of authority. *See Waterville Hotel Corp. v. Board of Zoning Appeals*, Me., 241 A.2d 50 (1968).

■ Our conclusion that § 3.6(2) is invalid does not affect, however, the result in

**9.** The Plaintiff apparently does not contest the Department's determination that his application for installation of holding tank systems, though prohibited under Table 9–1, did not satisfy the criteria for a variance under § 3.6. Accordingly, we treat the issue as waived. *Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 841 (1978).

**10.** Section 3.6 provides as follows:
The Department may vary requirements of this code if ALL the following conditions are met;
(1) The system will serve an existing building or lot legally recorded prior to January 1, 1970.

(2) The variance request has the approval and endorsement of the municipality.
(3) The evaluator can document, because of lot size, location, topography, etc., [that] the proposed system will adequately treat and dispose of the wastewater with no threat to public health and safety.
(4) Compliance with the code would cause unusual hardship or would not result in construction of the best practicable system. Undue hardship shall not include any condition that is the result of action taken by the applicant or prior owner.

**11.** *See* 30 M.R.S.A. § 3221(1), (2) (1978).

this appeal. The record indicates that there is rational support for the Department's conclusion that the Plaintiff did not satisfy subsection (1) as well as subsections (3) and (4). Each of these valid provisions expressed independently legitimate rationales for denying a variance and, as the prefatory language of § 3.6 made clear, the failure of the applicant to meet the conditions of any one provision would have been sufficient to deny a variance. Moreover, the Code itself declared that its provisions were severable, thus obliging us to give effect to subsections (1), (3), and (4) of § 3.6,[12] notwithstanding our holding concerning subsection (2).

We conclude that the Department properly denied the Plaintiff a variance under § 3.6.

Accordingly, the entry will be:

Appeal denied.

Judgment affirmed.

All concurring.

---

12. Section 1.21 of the Code provided as follows:

The provisions of this code are severable. If any provision of this code is invalid, or if the application of this code to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application.